IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDDY RIVERA, on behalf of himself and others similarly situated, | : : | CIVIL ACTION |
| Plaintiff, | : | ELECTRONICALLY FILED |
| v. | : | ON MARCH 15, 2020 |
| | : | |
| MARTIN'S FAMOUS PASTRY SHOPPE, INC., | : : | CLASS ACTION |
| Defendant. | : | JURY TRIAL DEMANDED |
| | : | |

## COMPLAINT – CLASS ACTION

Freddy Rivera ("Plaintiff") bring this class action lawsuit against Martin's Famous Pastry Shoppe, Inc. ("Defendant") for violations of Massachusetts Wage Act ("MWA"), Mass. Gen. Laws ch. 149, §§ 148, *et seq*.[1]

## JURISDICTION AND VENUE

1.    Jurisdiction is proper under 28 U.S.C. § 1332.

2.    Venue is proper under 29 U.S.C. § 1391 because Defendant is headquartered in this judicial district.  Moreover, the "Independent Distributor Agreement" between Plaintiff and Defendant requires that litigation occur in the federal or state court encompassing Franklin County.  *See* Ex. B at § 9.3.

---

[1]  On March 10, 2020, the Massachusetts Attorney General authorized Plaintiff to pursue this lawsuit on behalf of himself and other similarly situated workers.  *See* Ex. A.

## PARTIES

3.     Plaintiff resides in Roslindale, MA.

4.     Defendant is headquartered in Chambersburg, PA.

## FACTS

5.     Defendant is in the business of manufacturing, distributing, and selling potato rolls and other baked goods to retailers, wholesalers, and institutions.

6.     The distribution of baked goods to such customers falls within Defendant's usual course of business.  In this regard, Defendant's products "are currently distributed along the east coast of the United States, from Florida to Maine, and also in the Chicago area," *see* https://potatorolls.com/about/faqs/ (last viewed 3/13/20), and its "mission" includes "provid[ing] the best sales distribution support," *see* https://potatorolls.com/ (last viewed 3/13/20).  Defendant "continues to dominate in the markets where it has established full distribution."  *See* https://potatorolls.com/about/ (last viewed 3/13/20).

7.     Defendant pays workers to distribute its products to customers within specific geographic areas referred to as "territories."  Defendant calls these workers "Distributors" and generally requires them to form closely-held corporations as a condition of working for Defendant.

8.     Distributors must pay Defendant thousands of dollars to purchase their territories.

2

9.     Plaintiff worked for Defendant as a Distributor in Massachusetts until around January 2020.  His corporation was called "Angel LLC" and maintained a "principal place of business" at his house.  *See* Ex. B at p. 2.

10.     Plaintiff and other Distributors are not customarily engaged in independent food distribution businesses.  On the contrary, Plaintiff's business existed for the sole purpose of working for Defendant, and Defendant strictly prohibited him from "market[ing], distribut[ing], or sell[ing] fresh baked bread or roll products, or snack[] Products from any source other than MARTIN'S."  Ex. B at § 2.4.

11.     Defendant controls virtually every aspect of the work performed by Plaintiff and other Distributors by, *inter alia*, recording their daily activities via "hand-held delivery devices," making all product pricing decisions, regulating the display of products on store shelves, visiting and inspecting Distributors' assigned stores to ensure compliance with company policies and procedures, and requiring Distributors to follow detailed "Preferred Distribution Guidelines" and "Preferred Guidelines for MIS."  *See*, *e.g.*, Ex. B (attaching "Preferred Distribution Guidelines" and "Preferred Guidelines for MIS").

12.     A worker's employment status is determined by the applicable statutory and decisional law, not by contractual labels.  *See generally Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229-30 (3d Cir. 2019).  Here, Plaintiff and other

Distributors are employees under the Massachusetts Independent Contractor Statute. *See* Mass. Gen. Laws ch. 149, § 148B(a).

13.    Defendant requires Plaintiff and other Distributors to either purchase or lease "hand-held delivery devices."

14.    Each week, Defendant makes withholdings/deductions from the earnings of Distributors.  These withholdings/deductions include, *inter alia*, equipment fees, promotional and product discount charges, stale and shrink charges, route fees, and various other deductions associated with Defendant's business.

15.    Each week, Plaintiff and other Distributors are required to personally pay for work-related expenses such, *inter alia*, gas expenses, vehicle maintenance/repair expenses, and insurance expenses.

16.    Plaintiff estimates that Defendant has subjected him to wage deductions and work-related expenses totaling over $75,000.

## CLASS ALLEGATIONS

17.    Plaintiff brings this action on behalf of himself and other individuals who, during any time within the past three years, worked for Defendant in Massachusetts as a Distributor either individually or through a closely-held corporation.

18.    Class treatment is appropriate because all of Federal Rule of Civil Procedure 23's class action requisites are satisfied.  In particular:

(a)  The class includes over 40 individuals, all of whom are readily ascertainable based on Defendant's records and are so numerous that joinder of all class members is impracticable.

(b)    Plaintiff is a class member, his claims are typical of the claims of other class members, and he has no interests that are antagonistic to or in conflict with the interests of other class members.

(c)    Plaintiff and his lawyers will fairly and adequately represent the class members and their interests.

(d)    Questions of law and fact are common to all class members, because, *inter alia,* this action concerns Defendant's common business policies and practices, as summarized herein.  The legality of these practices will be determined through the application of generally applicable legal principles to common facts.

(e)    Common questions of law and fact predominate over questions affecting only individual class members.

(f)    Class litigation is superior to other available methods for the fair and efficient adjudication of this action.

## COUNT I

19.    All previous paragraphs are incorporated as though fully set forth herein.

20.    The MWA requires prompt and full payment of wages due.

5

Specifically:  "Every person having employees in his service shall pay weekly or

bi-weekly each such employee the wages earned by him to within six days of the

termination of the pay period during which the wages were earned if employed for

five or six days in a calendar week . . . ."  Mass. Gen. Laws ch. 149, § 148.

Employees aggrieved under the MWA may bring a civil action, *see id.* at § 150,

and employers may not escape liability through "special contract[s] with an

employee," *id.* at § 148.

21.    Massachusetts courts have "made clear that any attempt by an

employer to shift the ordinary costs of doing business to its employees must be met

with skepticism and carefully scrutinized."  *Martins v. 3PD Inc.*, 2014 U.S. Dist.

LEXIS 40638, *16 (D. Mass. Mar. 27, 2014).

22.    Here, Defendant violated the MWA by requiring Plaintiff and other

class members to pay for their jobs/territories, subjecting them to various charges,

withholdings, deductions as described above, and requiring them to pay for various

job-related expenses as described above.  *See*, *e.g.*, *Martins*, 2014 U.S. Dist.

LEXIS 40638, at *22-25 (MWA violated where employees required to bear costs

of "in-home damage claims," broken freight," "various insurance policies," various

"administrative fees," truck maintenance expenses, and truck lease payments);

*Awuah v. Coverall North America, Inc.*, 952 N.E.2d 890, 899-901 (Mass. 2011)

(MWA violated where employees required to bear "liability-focused insurance

costs" and "franchise fees"); *Camera v. Attorney General*, 941 N.E.2d 1118, 1124 (Mass. 2011) (MWA violated where employees charged for costs attributable to at-fault accidents).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff seeks the following relief on behalf of himself and other class members: (A) class certification; (B) payments equaling the value of all improper deductions/withholdings; (C) reimbursement for all work-related expenses and territory payments; (D) all available penalties/statutory damages (including treble damages) available under Massachusetts law; (E) pre-judgment interest; and (F) any other relief the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial.

Date: March 15, 2020                    Respectfully,

Peter Winebrake
R. Andrew Santillo
Mark J. Gottesfeld
WINEBRAKE & SANTILLO, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491

Harold L. Lichten*
Matthew Thomson*
Zachary L. Rubin*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000

7

Boston, MA  02116
(617) 994-5800

\* *pro hac vice* admission anticipated

*Attorneys for Plaintiff*

# Exhibit A



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
**ATTORNEY GENERAL**

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

March 10, 2020

Attorneys Harold L. Lichten and Zachary L. Rubin
Lichten & Liss-Riordan, P.C.
729 Boylston St., Suite 2000
Boston, MA  02116

RE:  Freddy Rivera
     Request for Private Right of Action against Martin's Famous Pastry Shoppe, Inc.

Dear Attorneys Lichten and Rubin:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit.  If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

Sincerely,

Fair Labor Division
Office of Attorney General Maura Healey
(617) 727-3465

# Exhibit B

Version 7.16.2012

**MARTIN'S FAMOUS PASTRY SHOPPE, INC.**

**INDEPENDENT DISTRIBUTOR AGREEMENT**

Version 7.16.2012

**MARTIN'S FAMOUS PASTRY SHOPPE, INC.**

**INDEPENDENT DISTRIBUTOR AGREEMENT**

THIS AGREEMENT (this "<u>Agreement</u>") is made this _11TH_ day of _OCTOBER_ , 2014, by and between ANGEL LLC, a Massachusetts limited liability company, having a principal place of business at 1 Mercedes View, Roslindale, MA 02131, hereinafter called the "<u>DISTRIBUTOR</u>", and MARTIN'S FAMOUS PASTRY SHOPPE, INC., a Pennsylvania corporation having its offices at 1000 Potato Roll Lane, Chambersburg, Pennsylvania, hereinafter called "<u>MARTIN'S</u>."

WITNESSETH:

WHEREAS, subject to the terms and conditions that follow, MARTIN'S desires to engage DISTRIBUTOR and DISTRIBUTOR desires to be engaged as the exclusive independent distributor in a designated Territory, as defined below, of consigned Products, as defined below, sold by MARTIN'S and bearing MARTIN'S trademarks.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions that follow, and other good and valuable considerations, the parties hereto mutually agree as follows:

1.     <u>DEFINITIONS</u>.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"<u>Best Sales Efforts</u>" shall mean the duties reasonably calculated to maximize and expand sales of MARTIN'S Products within the Territory and to ensure Customer satisfaction and goodwill. which duties include, but are not limited to: (i) maintenance of an adequate and fresh supply of Products with Customers, which will require a minimum of 3 days of delivery each week to each Customer within the Territory, unless 2 days of delivery per week are adequate for a Low Volume Store or Convenience Store; (ii) employing proper handling and storage methods and facilities to maintain the freshness and quality of the Products; (iii) prompt removal of all stale or overcoded merchandise; (iv) preservation or expansion of shelf space for Products in Customer locations; (v) compliance with all service and delivery requirements established by Customers; (vi) conduct of DISTRIBUTOR'S business in a manner that will reflect favorably on MARTIN'S, its Products and good name; and (vii) the solicitation and acquisition of new Customers within the Territory.

"<u>Customer(s)</u>" shall mean retailers, wholesalers and institutional outlets, including without limitation, restaurants, on-premise eating places, schools, hospitals and other like institutions.

"<u>Low Volume Store</u>" shall mean a Customer's store or outlet purchasing less than 50 bakery net units per week when properly serviced by Distributor, and shall not include any store or outlet owned or operated by a Martin's Strategic Customer.

"<u>Convenience Store</u>" shall mean those retail locations which have a limited offering of groceries and household goods.

"<u>Martin's Strategic Customer</u>" shall mean Customers having multiple outlets or facilities which span more than one route or territory, including but not limited to any chain stores that have outlets within more than one territory.

2

"Preferred Distribution Guidelines" shall mean those guidelines provided by MARTIN'S from time to time to assist DISTRIBUTOR in meeting Best Sales Efforts.

"Product(s)" shall mean all fresh baked products, snack items and other products produced by MARTIN'S and/or consigned by MARTIN'S to DISTRIBUTOR for distribution to Customers.

2.    DISTRIBUTORSHIP.

    2.1.    Appointment.

        (a)    Subject to the terms and conditions contained herein, MARTIN'S hereby appoints DISTRIBUTOR to be its exclusive distributor to sell the Products to Customers within the Territory defined in Section 2.2 below; provided, however, nothing contained herein shall prohibit MARTIN'S from directly marketing and/or selling Products to wholesale food distributors and institutional outlets in the Territory for distribution outside the Territory or to food service or institutional Customers in the Territory.

        (b)    Unless agreed to in writing by MARTIN'S in its sole discretion, DISTRIBUTOR shall not market, solicit or accept orders or distribute the Products to Customers, distributors or others that are located, or that DISTRIBUTOR knows or reasonably should know intend to market or sell Products, outside the Territory, and shall refer all Product inquiries from outside the Territory to MARTIN'S.

        (c)    It is the essence of this Agreement that the DISTRIBUTOR is an independent contractor. The DISTRIBUTOR shall not be considered or deemed in any way to be an employee, partner, agent or joint-venturer of MARTIN'S and has no right or power, expressed or implied, to do any act or thing that would bind MARTIN'S. Except as set forth in this Agreement, DISTRIBUTOR shall not be prevented from engaging in any other business or profession. It is understood that DISTRIBUTOR shall not be covered by any of the employment policies, benefit plans or terms or conditions of employment effective at MARTIN'S.

    2.2.    Territory.

        (a)    The Territory is shown or described in Schedule A attached hereto (the "Territory") and may consist of a geographic territory or a list of Customer locations.

        (b)    Both parties agree that the number of Customers and/or the volume of business within the Territory may at sometime become too large to be properly serviced without the expansion of the DISTRIBUTOR'S staff. If either party, in its sole discretion, determines that the Territory has become too large, then both parties shall promptly negotiate in good faith for the provision of additional staff by DISTRIBUTOR for service or to subdivide said Territory for the benefit of all concerned parties and to ensure that all Customers within the Territory are receiving prompt, regular and satisfactory service. Failure of the DISTRIBUTOR either to provide the required level of service and exercise Best Sales Efforts within the Territory or to permit modification of said Territory when required, as determined by DISTRIBUTOR and MARTIN'S in good faith, shall be deemed an event of default under this Agreement.

        (c)    Both parties agree that as new sales areas are developing, it may become necessary to adjust routes and Customers serviced by DISTRIBUTOR and to adjust the Territory. Both parties agree to negotiate in good faith to make such adjustments as are necessary in the routes, Customers serviced and Territory to ensure Customers within the Territory are receiving prompt, regular and satisfactory service. Under no circumstances shall MARTIN'S be required to compensate DISTRIBUTOR for the adjustment of routes, however, compensation may be appropriate from other distributors.

Version 7.16.2012

(d)     Notwithstanding anything to the contrary contained herein, MARTIN'S may service Customers or arrange for another distributor to service Customers immediately in the event (i) DISTRIBUTOR does not exercise Best Sales Efforts or provide prompt, regular or satisfactory service and support to Customers; or (ii) DISTRIBUTOR is unable or refuses to service Customers. Notwithstanding anything to the contrary contained herein, MARTIN'S may service a Customer or arrange for another distributor to service a Customer, if that Customer requests alternative service.

2.3.    Obligations and Representations of DISTRIBUTOR.

(a)     DISTRIBUTOR represents that it has full power and authority to enter into this Agreement and perform the obligations hereunder without violating any agreement with any third party, or any law or regulation, and that the person signing this Agreement on behalf of it has been duly authorized and empowered to execute this Agreement on behalf of DISTRIBUTOR. DISTRIBUTOR acknowledges that it has read this Agreement, understands it, and has had the opportunity to seek such legal advice as it feels appropriate.

(b)     DISTRIBUTOR will perform all obligations under this Agreement in a highly professional and skilled manner, and will ensure that its employees act in a professional, skilled and courteous manner.

(c)     The DISTRIBUTOR shall have the responsibility, at its expense, to maintain adequate tools and equipment, and to hire or retain employees, agents, assistants or contractors, as necessary, to provide regular and satisfactory service and support to each and every Customer within the Territory and to exercise Best Sales Efforts. The manner by which DISTRIBUTOR meets its obligations to exercise Best Sales Efforts are within DISTRIBUTOR'S discretion, but MARTIN'S shall provide Preferred Distribution Guidelines to assist DISTRIBUTOR in meeting its obligation to provide Best Sales Efforts.

(d)     DISTRIBUTOR is responsible for compliance with any applicable state, federal or municipal laws, ordinances or regulations which may relate to his performance of services under this Agreement, including, without limitation, all food safety and food defense (security) regulations and guidelines, and all labor and employment laws (including payroll, worker's compensation and unemployment compensation tax) relating to any employees DISTRIBUTOR may employ in connection with the performance of services under this Agreement.

(e)     Under no circumstances will DISTRIBUTOR sell or dispose of overcoded or stale, frozen or otherwise preserved Products. Such Products shall be returned to MARTIN'S immediately.

(f)     DISTRIBUTOR will be responsible for all expenses he may incur in carrying out his duties under this Agreement.

(g)     DISTRIBUTOR agrees that it shall at its sole cost and expense maintain accurate books and records at its principal place of business covering all transactions and other matters relating to the marketing, distribution and sale of consigned Products. MARTIN'S, or its duly authorized representatives, shall have the right, after seven (7) days written notice and during DISTRIBUTOR'S normal business office hours to examine DISTRIBUTOR'S books of account and all records pertaining to the distribution, marketing and sale of the consigned Products in the possession or under the control of DISTRIBUTOR and to make copies and extracts thereof at their own expense. All books of account and records shall be kept available for at least three (3) years.

4

Version 7.16.2012

(h)    DISTRIBUTOR shall, at its own cost and expense, use hand-held delivery devices designated by MARTIN'S. The hand-held devices must be leased or purchased by DISTRIBUTOR, but software for the devices shall be installed and maintained by MARTIN'S. MARTIN'S may, but is under no obligation to, refund or waive fees paid by DISTRIBUTOR for the use of hand-helds, and will only do so if the DISTRIBUTOR uses the hand-held devices properly, consistently and in accordance with MARTIN'S Preferred Distribution Guidelines.

(i)    DISTRIBUTOR agrees to supply MARTIN'S with names of all accounts served.

(j)    During the term hereof and for a period of no less than five (5) years thereafter, DISTRIBUTOR shall, at its own expense, maintain general liability insurance and commercial automobile liability insurance with a carrier with an A.M. Best rating of A- or better providing coverage of at least $1,000,000.00 (one million dollars) per occurrence. Such policies shall include Martin's as an additional named insured, provide for a waiver of subrogation rights against Martin's, and require Martin's to receive not less than sixty (60) days' notice of any modification or termination of coverage. DISTRIBUTOR will provide MARTIN'S with written evidence of same upon request. Distributor shall maintain adequate worker's compensation insurance and shall provide proof of such insurance upon request by Martin's.

(k)    DISTRIBUTOR agrees to place all orders for Products with MARTIN'S as outlined in the Preferred Distribution Guidelines.

(l)    DISTRIBUTOR must distribute to each Customer in the Territory all Products authorized by that Customer that are offered for consignment by MARTIN'S.

2.4.    Competitive Products.    DISTRIBUTOR will not market, distribute or sell fresh baked bread or roll products, or snacks Products from any source other than MARTIN'S.

3.    PRICES AND PAYMENT TERMS.

3.1.    Payment Terms.    On a weekly settlement basis, the DISTRIBUTOR will remit to MARTIN'S the consignment price of all Products delivered to and sold by the DISTRIBUTOR during the preceding week, adjusted for stale or overcoded merchandise which is promptly removed and returned by the DISTRIBUTOR, promotional allowances, scan based trading allowances, and unpaid purchases of racks, uniforms and other items from MARTIN'S. Such remittance will be made one week after receipt by DISTRIBUTOR of billing statement by MARTIN'S.

3.2.    Receivables. Except for those accounts approved and billed by MARTIN'S, the DISTRIBUTOR agrees to carry all accounts receivable and be responsible for any payment shortfall.

3.3.    Martin's Strategic Customers.    In cases where the DISTRIBUTOR sells Products to approved Martin's Strategic Customers, whose managers are not permitted to pay cash for merchandise, MARTIN'S will accept slips signed by the Martin's Strategic Customer's manager, or his designee, computerized acceptance forms, store stamped delivery ticket or other Customer suitable proof of delivery, in lieu of cash and will credit the DISTRIBUTOR'S account. MARTIN'S will bill such Martin's Strategic Customers for deliveries based upon such signed slips. Should Martin's Strategic Customers implement scan based trading systems or procedures, DISTRIBUTOR shall participate in such systems or procedures in accordance with policies imposed by the Martin's Strategic Customers. MARTIN'S will provide billing services for Martin's Strategic Customers free of charge to DISTRIBUTOR provided DISTRIBUTOR complies with MARTIN'S billing practices, including Preferred Distribution Guidelines. MARTIN'S reserves the right to charge a reasonable amount for such services if such billing practices are not complied

Version 7.16.2012

with by DISTRIBUTOR.  MARTIN'S will provide at least seven (7) days notice of the implementation of such a charge.  DISTRIBUTOR shall be responsible for all Customers initiated offsets, fines and chargebacks.  DISTRIBUTOR carries the risk for non-payment by its Customers.

3.4.    Charges to Customers.  DISTRIBUTOR will establish its own price for Products sold to Customers, provided, however, DISTRIBUTOR agrees that certain Martin's Strategic Customers and institutional accounts will negotiate prices, services and credits directly with MARTIN'S and may implement scan based trading systems and procedures which must be implemented and adhered to by the DISTRIBUTOR.

3.5.    Direct Billing.  At the request of DISTRIBUTOR, MARTIN'S may undertake to bill Customers, other than Martin's Strategic Customers, on behalf of DISTRIBUTOR, but MARTIN'S shall not be under any obligation to do so, and may condition providing such billing services on Customers' credit history, sales volume and other factors.  DISTRIBUTOR must guaranty the obligations of any Customer billed by MARTIN'S at DISTRIBUTOR'S request.

4.    DELIVERY OF PRODUCT.

(a)    MARTIN'S  agrees to use its best efforts in a commercially reasonable fashion to deliver the Products to the DISTRIBUTOR at MARTIN'S designated warehouse and the DISTRIBUTOR agrees to accept from each delivery sufficient quantities of the Products to supply Customers in the Territory pursuant to DISTRIBUTOR'S order and consistent with Best Sales Efforts.

(b)    Products will be consigned on terms as established by MARTIN'S in good faith and in accordance with MARTIN'S policy.

(c)    MARTIN'S further agrees to accept the return of unsold stale or overcoded merchandise and will reimburse DISTRIBUTOR for the cost of such unsold stale or overcoded merchandise provided that the return is not the result of DISTRIBUTOR'S decision to deliver product in excess of MARTIN'S customer sales forecast to a specific Customer or is otherwise a result of DISTRIBUTOR'S failure to follow the Preferred Distribution Guidelines.  MARTIN'S will not accept the return of fresh or undelivered Product.

(d)    MARTIN'S shall not be obligated to sell its Products to DISTRIBUTOR in excess of MARTIN'S then current production capabilities.  In case of Product shortages for any reason, MARTIN'S reserves the right to fill orders in its sole discretion based upon the amount of Product available, other production considerations and overall customer requirements; provided that, MARTIN'S shall make good faith efforts to fill DISTRIBUTOR'S orders as requested and in a timely manner.

(e)    MARTIN'S agrees to consult with DISTRIBUTOR concerning "drop shipments" to retail outlets.  Where the parties mutually agree that "drop shipments" are mutually advantageous, either party may make arrangements for such shipments on terms as established by said agreement.  Either party may withhold consent to permit drop shipments within the Territory, provided, that consent shall not be unreasonably withheld.

(f)    DISTRIBUTOR shall assume all risk of loss due to damage to or destruction or loss of the MARTIN'S Products once Products are loaded on the DISTRIBUTOR'S delivery vehicle(s) or any delivery vehicle(s) belonging to any employee, agent or representative of DISTRIBUTOR.

(g)    Notwithstanding anything to the contrary contained herein, MARTIN'S need not offer all Products it sells to DISTRIBUTOR for distribution hereunder.

Version 7.16.2012

5.    INTELLECTUAL PROPERTY.

5.1.    Trademark Rights. DISTRIBUTOR acknowledges MARTIN'S exclusive right, title and interest in and to any and all trademarks, copyrights and trade names owned by MARTIN'S, and will not in any way, directly or indirectly, do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of said right, title and interest. DISTRIBUTOR shall not in any manner represent that it has any ownership in MARTIN'S trademarks, trade name or copyrights, and all use of MARTIN'S trademarks, copyrights and trade name shall inure to the benefit of MARTIN'S. DISTRIBUTOR covenants that it will at no time adopt or use any word or mark which is similar to or likely to cause confusion with any trademark or trade name of MARTIN'S. DISTRIBUTOR shall not use any corporate name, trade name or trademark in connection with the advertising, offering for sale or sale of any MARTIN'S Products which is confusingly similar to any corporate name, trade name or trademark used by MARTIN'S. DISTRIBUTOR shall use its own corporate name on all business letterhead, order blanks, bill heads, contracts, and other documents pertaining to its relationship with Customers and suppliers and other persons furnishing goods or services to DISTRIBUTOR. In connection with its relationship with such Customers, suppliers and furnishers of goods and services, DISTRIBUTOR shall not use any of MARTIN'S trademarks or trade names, or otherwise act, so as to lead such persons to believe that DISTRIBUTOR is employed by or an agent of MARTIN'S, or affiliated in any way other than as defined herein an independent distributor.

5.2.    DISTRIBUTOR'S Vehicle. Upon the request of DISTRIBUTOR, MARTIN'S shall apply its trademarks or advertising to DISTRIBUTOR'S delivery vehicles in accordance with the following terms:

(a)    MARTIN'S may refuse to apply such trademarks or may insist on the removal of such trademarks from any vehicle which MARTIN'S determines to be in such state of disrepair that it does not serve as a beneficial form of advertising.

(b)    MARTIN'S has no duty to paint any area of any vehicle in which MARTINS trademark or other advertising does not appear.

(c)    MARTIN'S may determine the colors, application, style and trade name or other advertising, which shall appear in the painted area of the vehicle.

(d)    DISTRIBUTOR shall remove all references to MARTIN'S or its Products upon disposition of said vehicle or the termination of this Agreement.

(e)    DISTRIBUTOR shall be responsible for all other aspects of vehicle maintenance including but not limited to annual inspections and compliance with any and all other federal, state or municipal statutes or ordinances, and all food safety and food defense regulations and guidelines.

6.    ASSIGNMENT.

This exclusive right to sell and deliver Products within the Territory may be sold, assigned, transferred, or bequeathed by the DISTRIBUTOR or, in the event of his/her death if the DISTRIBUTOR is an individual, by the representative of his/her estate, with the prior written consent of the MARTIN'S, which consent will not be unreasonably withheld; provided, however, that any sale, whether made by the DISTRIBUTOR or by his/her estate, shall be subject to a first right of refusal on the part of MARTIN'S, which right shall expire if not exercised within twenty-one (21) days after receipt by MARTIN'S of a written notice of the DISTRIBUTOR'S intention to sell to a named bona fide purchaser, together with the

Version 7.16.2012

terms, conditions and price of such proposed sale. If MARTIN'S exercises its right of first refusal, it shall agree to purchase the same on the same terms and conditions as said bona fide purchaser and the price and terms of such sale. DISTRIBUTOR shall remain responsible for all monetary obligations under this Agreement of DISTRIBUTOR or its employees/agents. Any third party purchaser or assignee shall be obligated to sign MARTIN'S then current form of distributor agreement. In the event of the dissolution, death or permanent disability of the DISTRIBUTOR or if he/she, as the case may be, has not sold or otherwise transferred or bequeathed exclusive right within a period of ninety (90) days from the date of dissolution, death or permanent disability, MARTIN'S shall have the right to sell the same after reasonable notice and advertisement to the highest qualified bidder for the account of the DISTRIBUTOR or his/her estate, or to purchase the same for MARTIN'S own account, at the then current fair market price. Then current fair market price will be determined in good faith by MARTIN'S and the DISTRIBUTOR using the current fair market value of all franchises of premium bread companies in the geographical area concerned at the time and with due consideration of the volume and profitability of the Territory. If the parties cannot agree on a purchase price, then the matter shall be referred to arbitration under the auspice of American Arbitration Association and any determination of the arbitrator shall be final and binding on all parties.

7.    LIABILITY.

7.1.    Indemnity. DISTRIBUTOR hereby agrees to indemnify and hold harmless MARTIN'S from and against any and all claims, demands, actions, investigations, costs, liabilities, damage or losses, including without limitation, reasonable attorneys' fees and expenses, incurred or suffered by MARTIN'S directly or indirectly in connection with:

(a)    the failure of DISTRIBUTOR to strictly abide by the terms of this Agreement, including without limitation, any DISTRIBUTOR actions with respect to Customers; and

(b)    any activities of DISTRIBUTOR or its agents or employees in handling, storing, delivering, marketing, or distributing the Products, or performing services under this Agreement.

7.2.    MARTIN'S shall not be liable for any action, suit or claim, sounding in contract or tort, asserted against DISTRIBUTOR regardless of whether or not said action, suit or claim arises from or relates to DISTRIBUTOR'S performance of services under this Agreement.

8.    TERMINATION.

8.1.    Termination by DISTRIBUTOR. DISTRIBUTOR shall have the right to terminate this Agreement at any time by giving MARTIN'S sixty (60) days notice in writing of his intention to terminate.

8.2.    Termination by MARTIN'S. MARTIN'S shall not terminate this Agreement except for good cause which shall include the following; but in no event shall such termination relieve the DISTRIBUTOR of any of its obligations hereunder incurred prior to such termination:

(a)    Upon DISTRIBUTOR'S failure to cure any default or breach of any obligation under this Agreement, including DISTRIBUTOR'S obligations under Section 2.3, within fourteen (14) days after written notice by MARTIN'S.

(b)    Immediately upon the judicial determination of insolvency or bankruptcy of the DISTRIBUTOR following an opportunity by DISTRIBUTOR to contest such determination; the making of an assignment for the benefit of creditors; the appointment of a receiver or trustee of any part of the

8

Version 7.16.2012

assets of the DISTRIBUTOR'S business following an opportunity by DISTRIBUTOR to contest such appointment; or the cessation of business by DISTRIBUTOR.

      (c)    Immediately upon written notice to DISTRIBUTOR in the event of DISTRIBUTOR'S nonpayment of any sums due to MARTIN'S.

      (d)    Immediately upon written notice to DISTRIBUTOR in the event the DISTRIBUTOR or its agents or employees commits a criminal, fraudulent, dishonest, or unethical act, such as stealing, claiming entitlement to payment of amounts not due from MARTIN'S, not billing Customers properly for delivered Products or not providing credit for proper returns.

      (e)    Immediately upon written notice to DISTRIBUTOR in the event of the closing or cessation of DISTRIBUTOR'S business.

      (f)    Immediately upon written notice to DISTRIBUTOR in the event DISTRIBUTOR refuses to service or deliver to any Customer in the Territory.

      (g)    Immediately upon DISTRIBUTOR'S bad faith in carrying out the terms of this Agreement.

      (h)    Immediately in the event of DISTRIBUTOR'S actions or inactions causing a threat to public health or safety, or which otherwise threatens to result in substantial harm to MARTIN'S business or reputation.

    8.3    <u>Event of Default</u>.  Upon the occurrence of a breach or event of default by DISTRIBUTOR of this Agreement, MARTIN'S may, immediately upon notice to DISTRIBUTOR, suspend deliveries to DISTRIBUTOR and arrange for distribution to Customers in the Territory by MARTIN'S or another distributor.

9.    <u>MISCELLANEOUS</u>.

    9.1.    This Agreement cannot be modified or amended except by a writing signed by both parties hereto.

    9.2.    If any provision of this Agreement is found by a court of competent jurisdiction to be legally invalid or unenforceable, such provision shall be severed from this Agreement without effecting the validity and enforceability of the remainder of this Agreement.

    9.3.    This Agreement, whenever called upon to be construed, interpreted or enforced, shall be governed by the domestic internal laws of the Commonwealth of Pennsylvania, without reference to any choice of law or conflict of laws principals.  Franklin County, Pennsylvania, shall be considered the place of execution of the Agreement.  The parties agree that the Court of Common Pleas of Franklin County and the United States District Court for the Middle District of Pennsylvania shall be the forums for all disputes or controversies arising hereunder, and agree to the jurisdiction of such courts.

    9.4.    This Agreement shall be binding upon the heirs, personal representatives, successors, assignees, designees or related entities of the parties hereto.

    9.5.    No course of dealing, delay or failure by either party to exercise or enforce at any time any right or provision of this Agreement shall be considered a waiver thereof or of such party's right thereafter to exercise or enforce each and every right and provision of this Agreement.  A valid waiver shall be in

Version 7.16.2012

writing, but need not be supported by consideration. A valid waiver of any provision of this Agreement with respect to a particular situation or event shall not constitute a waiver of such provision with respect to other situations or events.

9.6.    Sections 2.3(g), 2.3(j), 5, 7, and 9.3 herein shall survive termination or expiration of this Agreement.

*(Signature page follows)*

Version 7.16.2012

IN WITNESS WHEREOF, DISTRIBUTOR and MARTIN'S have hereunto set their hands and seals the day and year written above.

DISTRIBUTOR:

Attest:

ANGEL LLC

Name: _____

By: _Freddy Rivera_____
Name: _FReddY RiveRA_____
Title: _OWMeR_____

MARTIN'S:

Attest:

MARTIN'S FAMOUS PASTRY SHOPPE, INC.

_Judy Stayman_
Name:

By: _James A Martin_____
Name: _James A. Martin_____
Title: _President_____

[Signature page to Independent Distributor Agreement]

Version 7.16.2012

## MARTIN'S FAMOUS PASTRY SHOPPE, INC.

## INDEPENDENT DISTRIBUTOR AGREEMENT

### Schedule A

### Territory

The "Territory" consists of the following:

Route 14044

| Store Name | Store # | Store Address |
|---|---|---|
| A & B Burgers* | | 50 St. Peter Street, Salem, MA 01970 |
| BJ's | 30 | 6 Hutchinson Drive Danvers MA 01923 |
| Bonkers* | | 535 Lowell Street, Peabody, MA 01950 |
| Market Basket | 23 | 139 Endicott Street Danvers MA 01923 |
| Market Basket | 58 | 227 Highland Avenue Salem MA 01970 |
| New England Meat Market* | | 60-62 Walnut Street Peabody MA 01960 |
| Shaw's | 341 | 114-128 Essex Center Drive Peabody MA 01960 |
| Shaw's | 359 | 11 Traders Way Salem MA 01947 |
| Stop & Shop | 5 | 19 Howley Street Peabody MA 01960 |
| Stop & Shop | 15 | 450 Paradise Drive Swampscott MA 01907 |
| Target | 1187 | 240 Independence Way Danvers MA 01923 |

Route 14050

| Store Name | Store # | Store Address |
|---|---|---|
| BJ's | 205 | 66 Seyon Street, Waltham, MA 02153 |
| Brazilian Corner* | | 192 Brighton Avenue, Allston, MA 02134 |
| Conley's* | | 164 Belmont Street, Watertown, MA 02472 |
| Costco Wholesale Club | 308 | 71 Second Avenue, Waltham, MA 02154 |
| Francis Food Mart* | | 1064 Belmont Street, Watertown, MA 02172 |
| Hannaford Brothers | 8017 | 55 Russell Street, Waltham, MA 02154 |
| Nicholas Deli & Market* | | 11 Brighton Street, Belmont, MA 02178 |
| Star Market | 366 | 130 River Road, Waltham, MA 02154 |
| Star Market | 513 | 1070 Lexington Street, Waltham, MA 02154 |
| Star Market | 521 | 385 Western Avenue, Brighton, MA 02135 |
| Star Market Plus | 507 | 699 Mt. Auburn Street, Cambridge, MA 02138 |
| Star Market Plus | 551 | 535 Trapelo Road, Belmont, MA 02178 |
| Star Market Plus | 565 | 1065 Commonwealth Avenue, Boston, MA 02101 |
| Stop & Shop | 49 | 700 Pleasant Street, Watertown, MA 02172 |
| Target | 1442 | 550 Arsenal Street, Watertown, MA 02172 |

Route 14053

| Store Name | Store # | Store Address |
|---|---|---|
| Bunz Burgers* | | 20 Mitchell Road, Ipswich, MA 01938 |
| Hannaford Brothers | 8170 | 637 Lowell Street, W. Peabody, MA 01960 |
| Hannaford Brothers | 8286 | 3557 Broadway, Saugus, MA 01960 |
| Lexie's* | | 88 State Street, Newburyport, MA 01950 |

Version 7.16.2012

| Market Basket | 40 | 25 Storey Avenue, Newburyport, MA 01950 |
| Market Basket | 45 | 230 South Main Street, Middleton, MA 01949 |
| Market Basket | 49 | 225 Newburyport Turnpike, Rowley, MA 01969 |
| Shaw's | 357 | Port Plaza, Newburyport, MA 01950 |
| Stop & Shop | 93 | 301 Newbury Street, Danvers, MA 01923 |
| Stop & Shop | 407 | 164 Main Street, Saugus, MA 01906 |
| Stop & Shop | 499 | 100 Macy Street, Amesbury, MA 01913 |

## PREFERRED DISTRIBUTION GUIDELINES

Your Independent Distributor Agreement is a formal commitment between Martin's Famous Pastry Shoppe Inc. and you regarding your Martin's distributorship. It contains our responsibility to you as an independent distributor and, in return, your responsibility to yourself, your customers, your business and Martins.

Our "Mission" is to "Bake the best products and provide the best sales distribution support".

In the Agreement you have agreed to use your Best Sales Efforts in connection with the operation of your distributorship. Best Sales Efforts are defined in the Agreement as the duties reasonably calculated to maximize and expand the sales of MARTIN'S products and to ensure Customer satisfaction and goodwill. The following Preferred Distribution Guidelines have been developed to assist all of our independent distributors, including you, in meeting the "Best Sales Efforts" requirement in the Agreement. As an independent distributor for Martin's Famous Pastry Shoppe, Inc. your success relies in your ability to operate your distributorship effectively. It is our goal that these Preferred Distribution Guidelines become the roadmap to yours and Martin's success.

## PREFERRED DISTRIBUTION GUIDELINES

1. **Personal appearance**
   a. Martin's provides a premium product and expects personal appearance to reflect a professional image to our customers
   b. Clothing and accessories should be neat, clean and in good taste
   c. Good hygiene is required when handling a food product and maintaining a professional image
2. **Customers**
   a. Relationship
      i. Introduce yourself to key store personnel and develop a cordial relationship in order to enhance the success of obtaining additional displays and sales opportunities
      ii. Maintain a positive Attitude at all times. Smile often
      iii. Be aware and responsive to your customer's needs and requirements
   b. Service
      i. Order and deliver product for each day of warehouse delivery.
         1. Establish alternate plans for sickness, vacation, time off, or other interruptions to regular service
      ii. The minimum delivery requirement is designated in your Distributor Agreement. Additional deliveries will increase sales, manage returns, strengthen store relations, and provide for a more efficient work effort
      iii. Delivery days are determined by store volume. Best Sales Efforts require that you maintain an adequate and fresh supply of Products with each Customer.
      iv. Call backs are necessary to restock and/or refresh your shelf space. Doing so will increase sales, develop rapport with store management, and improve product availability.
      v. Hiring of additional staff may be needed for holiday and seasonal increases
   c. Receiving
      i. Know and follow receiving times and procedures for each account
      ii. Organize incoming and outgoing product quantities in invoice order
      iii. Double check order quantities prior to the receiving process
      iv. Price product as required by the customer
      v. Obtain proper proof of delivery i.e. signed invoice, DSD forms, etc.
      vi. Protect product during inclement weather
3. **Product**
   a. Price
      i. Use proper shelf signs, shelf tags/labels, product and promotion price stickers as required by the customer
   b. Orders
      i. Follow all HHC ordering instructions
      ii. Review orders regularly and adjust for seasonal, holiday, and promotional changes
      iii. Product adjustments must be made according to Sales Dept guidelines
4. **Shelf management**
   a. Display
      i. Product must be merchandised by the prescribed Martins planogram
      ii. Deliver and merchandise all authorized products regardless of space or season
      iii. Clean shelves of old product, dust, and debris on a regular basis
   b. Rotation
      i. Fresh product sells and reduces returns – recent deliveries are to be rotated behind previous deliveries
   c. Color Code policy

      i. The Color code policy is to be followed in order to assist in keeping product fresh, rotated, and ease of identification for removal from shelf. (See attached Pull by Color Code Policy).

      ii. Following color code policy ensures proper credit for returns

      iii. Best by date on the closure clip is for customer reference, only

      iv. Sell by date is to assist store in determining shelf life

5. **Holidays/Promotions**

    a. You are expected to maximize sales during high demand periods

    b. Plan ahead by seeking off shelf displays and appropriate headers

    c. Adjust your service schedule and days of service to meet increased demand

      i. Call backs are necessary to meet increased demand

    d. Forecast

      i. Submit recommended order quantities on time to maximize sales and manage returns

    e. Offer all promotions and display opportunities to your Independent accounts

6. **Pursue Additional Sales Opportunities**

    a. Institutional/Food service accounts

    b. Catering companies

    c. Uses by other departments within the store i.e. deli, meat and bakery depts.

    d. Deliver Special orders received by Martin's sales dept

    e. Support store Grand opening programs as required by the store

7. **Equipment**

    a. Maintain a reliable delivery vehicle

      i. Be certain the vehicle is of adequate size for relative volume

      ii. Appearance – clean and in good repair inside and out

      iii. Break down procedure

        1. Have a backup plan – mechanic, personnel, and equipment

        2. Notify customers and Martins sales manager of issue and expected service time

    b. Hand Held Computer/printer

      i. Your HHC is a useful sales tool to help manage your business. Enter all required information in order to display accurate reports and manage the shelf

      ii. Enter accurate on hand quantities

      iii. MIS guidelines must be followed

    c. Displays/Racks

      i. Contact store management for approval during increased sales opportunities i.e. promotions, holidays, and weekends.

      ii. Maintain display inventory for quick availability

      iii. Keep displays and racks refreshed and replace, as needed, for best appearance

    d. Trays/baskets are property of the bakery and must be returned in a timely fashion

      i. Other than the intended use is strictly prohibited

      ii. Damaged and unusable trays should be kept separate and marked as such

8. **Ending your day**

    a. Organize product returns in trays by like item in the same quantity as received

      i. Credit will be issued only for product conforming to the color code policy

      ii. Product quantities must match the unload stale report

    b. Paperwork

      i. Invoices and reports must be organized for return to the bakery. This will insure proper billing to our customers and a timely, correct settlement.

      ii. Specific requirements are outlined in the Billing Guidelines

9.  **Food Safety Guidelines**
    a.  Warehouse
        i.  You must follow Food Safety and Food Defense guidelines as required by the FDA.
        ii. Do not use the warehouse for personal item storage that impacts the product quality
    b.  Vehicle
        i.  You must follow Food Safety and Food Defense guidelines as required by the FDA. (See attached)

10. **Business Operations**
    a.  You must incorporate your business and operate your business through the incorporated entity.
    b.  You should pay all persons servicing your routes as W-2 employees.

## PREFERRED GUIDELINES FOR MIS

MIS Handheld support will be the contact point for all handheld equipment supply and support at 1-800-435-7626.

1. **New Route or Ownership Change**
   a. Martin's will supply all handheld equipment necessary for independent distributor to conduct sales of Martin's product line. There is a leasing fee associated with the handheld equipment. Martin's will typically waive the leasing fee if the independent distributor uses the equipment properly and in accordance with these preferred guidelines. The independent distributor will be notified in advance of any fee to be charged.
   b. All independent distributors should complete a Martin's supplied training program.
   c. It is recommended that the independent distributor purchase insurance to cover cost of equipment. Contact Martin's for a list of preferred insurance vendors.
   d. Independent distributor shall assume responsibility for lost or stolen equipment.
   e. Independent distributor or current helper/driver contact information must be kept up-to-date with Martins.
   f. New route equipment sent will include two copies of the Equipment Assignment Sheet. User should verify all information in the sheet. Both Wholesaler and Distributor should sign/date both copies and return one copy to Martin's MIS Department.

2. **Equipment Rules**
   a. Martin's will supply temporary replacement equipment to user if it is determined through troubleshooting methods with the support technician that a temporary replacement is needed while their equipment is returned for service.
   b. Independent distributor will be charged for returning equipment not received by Martins within acceptable time period.
   c. When there is a name change on a route Martin's will send two copies of the Equipment Assignment Sheet to the new independent distributor. Route user will verify equipment received from previous route user information and will sign and date both copies returning one copy to Martin's, keeping one copy for their records.
   d. Upon route closing all equipment must be returned to Martin's immediately to avoid unreturned equipment charge.

3. **Hand held equipment Electronic Communication**
   a. Independent distributor must have a reliable means of two way electronic communication.
      Methods in preferred order
         1. Internet (802.11), Wifi
         2. Dialup, non-digital line
         3. HHC internal cell phone
   b. Martin's will assess a monthly charge to independent distributors that implement the cell phone option for electronic communication process on a regular basis.
   c. Each route will be required to download/upload (TCOM) information to/from the handheld each day the handheld is used to service accounts, at the daily designated time.

4. **Support**
   a. Martin's will supply standard support hours with newly supplied equipment and upon request.
   b. When an independent distributor is leaving a message during on call hours they should leave the following information: route #, distributor name, complete phone number including area code (including backup if available) and a brief description of issue calling about.
   c. Independent distributors calling MIS handheld support during on-call hours must mark voice message as urgent to receive a return call from a support technician within 15 minutes. (use discretion as there could be a charge for this service)

## PREFERRED BILLING AND ACCOUNTS RECEIVABLE GUIDELINES

1. **Getting Started**
   a. **Upon signing a contract with Martin's, you must submit the following completed forms to Martin's Accounts Payable Department:**
      i. W-9 Form
      ii. Certificate of Resale for Sales Tax
      iii. Certificate of Insurance

2. **Training**
   a. **Martin's offers training in the following areas, please plan to participate:**
      i. Handheld Computer Training
      ii. Understanding your Settlement Statement and supporting documentation

3. **New Customers**
   a. **Guidelines for all new charge (buyback} customers:**
      i. Credit must be approved prior to making first charge delivery.
      ii. Cash delivery is acceptable in the interim.
      iii. New Customer must submit a credit application to Martin's Accounts Receivable Department.
      iv. Martin's Sales Department will notify you when the application process is complete.

4. **Accounting**
   a. **Paperwork**
      i. Organize Invoices, DSD's and Sales Registers in an orderly fashion. Remove all staples (staples damage our scanning equipment).
      ii. Please do not fold your paperwork.
      iii. Place paperwork in the brown folder marked with your route number, this envelope is provided by Martin's.
      iv. Place paperwork in the "outgoing" tub for Transport to pick up.
      v. Leave paperwork at the warehouse every day that you are there.
      vi. Paperwork should not be held to the end of the week, submit it to the Billing Department daily.
      vii. If extraordinary situations prohibit daily submission of paperwork, please contact the Martin's billing Department.
   b. **Brown Folders**
      i. Are provided by Martin's.
      ii. Ensure you are using the folder marked with the correct route number.
      iii. The envelope should contain Invoices, Voided Invoices, DSD's and Sales Registers.
      iv. The envelope should be free of foul language, bodily fluids, pornographic material and other offensive notations or enclosures.
   c. **Proof of Delivery**
      i. Is essential for Martin's to receive payment from the store.
      ii. Examples of proof of delivery are store stamps, signatures and DSD's.
      iii. Submit ALL DSD's to Martin's Billing Department.
      iv. Lack of proof of delivery may result in the invoice being charged back to the route if Martin's does not receive payment form the store within 90 days.
   d. **Barcodes**
      i. Adhere the bottom barcode from the invoice to the DSD.
      ii. Barcodes must be adhered to the front of the DSD.
      iii. Adhere barcode to an empty spot on DSD, avoid covering information.
   e. **Buyback Credit**
      i. Buyback credit is given on invoices if the guidelines below are met:

           1. Invoice and DSD's must be received by Martin's within 90 days of delivery.

           2. If submitted after 90 days, buyback credit will be given only if Martin's receives payment from the store within the 90 days following the delivery date.

  **f. Purchase Order Numbers**

     i. If required by the store, the number must be clearly displayed on the invoice.

     ii. The purchase order number must be the correct number.

  **g. Handwritten Invoices Must Clearly State**

     i. Customer name and number

     ii. Store number

     iii. Route number

     iv. Original ticket number

     v. Delivery date

     vi. Products and quantities

     vii. Promos and mathematical extensions

     viii. Store labels must be affixed to the handwritten ticket

  **h. Vendor Violations**

     i. Charged by the store will be passed on to the Wholesaler/Distributor.

**5. Communications**

  **a. Hardware**

     i. Maintain access to a computer sufficient to receive the Wholesaler/Distributor statement electronically.

  **b. T-Com**

     i. T-Com daily for downloads and uploads

     ii. If first attempt is unsuccessful, contact Martin's Handheld Support to ensure that repeated attempts to T-comm does not overwrite the original data.

**6. Questions**

  **a. Store Accounting Questions**

     i. Contact Martin's Account Receivable Department, please do not contact the store's accounting office

  **b. Settlement Statement Questions**

     i. Contact Martin's Billing Department

  **c. Handheld Computer Questions**

     i. Contact Martin's handheld support




1000 Potato Roll Lane • Chambersburg, PA 17202-8897 • 1-800-548-1200 • www.potatorolls.com

| COLOR CODE SCHEDULE | | |
|---|---|---|
| COLOR | DELIVERY DAY | PULL DAY |
| YELLOW | MONDAY | THURSDAY-FRIDAY |
| WHITE | TUESDAY | FRIDAY-SATURDAY |
| GREEN | THURSDAY | MONDAY |
| TAN | FRIDAY | MONDAY-TUESDAY |
| RED | SATURDAY | TUESDAY |
| All products are marked with a "Best By" and "Sell By" date | | |
| Products should be removed from the shelf prior to the **"Sell By"** Date | | |

Consolidated Standards for Inspection

## 1.26 Finished Product Transportation

*Finished product is coded for traceability, and shipping requirements are in place to prevent product contamination.*

Critical Requirements

1.26.1.1 Legible code marks that are easily seen by consumers are placed on all finished products.

1.26.1.2 Code marks **satisfy regulatory packaging requirements and** lot definitions, and are used in the Recall Program.

1.26.1.3 Distribution records identify the **initial point of distribution as** per regulatory requirements.

1,26.1.4 **Finished products are handled and transported** in a way that prevents actual or potential contamination.

1.26.1.5 Finished products are **loaded or transferred in covered bays** or canopies to protect the products from weather damage.

1.26.1.6 Temperatures of **perishable and frozen products** are taken and recorded upon loading.

1.26.1.7 Documentation validates that temperature-sensitive products are loaded into pre-cooled vehicles that are designed to **sustain required temperatures** during delivery.

1.26.1.8 Temperatures of **vehicles are checked and recorded** before loading.

1.26.1.9 The facility enforces **transportation breakdown procedures.**

1.26.1.10 Prior to loading, **all shipping vehicles are inspected for** cleanliness and structural defects that could jeopardize the product.

1.26.1.11 Shipping **vehicle inspections are documented.**

1.26.1.12 **Local delivery trucks and route trucks** are inspected and cleaned at least weekly to identify potential sources of foreign material contamination.

Minor Requirements

1.26.2.1 **Common carriers and customers** are encouraged to maintain their delivery vehicles in sanitary condition, and in good repair.

1.26.2.2 **Security seals or padlocks** are provided, and their use is documented as per facility or customer requirements.